PEOPLE v. DETROIT UNITED RAILWAY.

1. STREET RAILROADS—REGULATION—ORDINANCES—VIOLATION.

Under section 19, chapter 165, of the ordinances of Detroit (1904), requiring regular passenger cars to be run through to the ends of their respective routes, except that in cases of blockades and delays due to causes beyond control cars may be turned for the purpose of restoring service in the opposite direction, provided, that cars having passengers on board may not be turned unless a car following and going through to the end of the route is in the same block, and passengers are given transfers entitling them to transportation to their destination, the right to turn a car within the excepted class is not affected by the fact that the company has idle cars in its barn at the point where the turn is made, and men to operate them.

2. CARRIERS — STREET RAILROADS — PASSENGERS — TRANSFERS — RIGHT TO REQUEST.

It is the duty of passengers to secure evidence of payment of fares, and a conductor of one car is under no obligation to accept their statement that they paid their fares upon another car from which they have transferred.

3. STREET RAILROADS — REGULATION— ORDINANCES — VIOLATION — DENIAL OF TRANSFERS.

Under section 19, chapter 165, of the ordinances of Detroit (1904), a street car cannot lawfully be turned before reaching its destination unless the passengers thereon are given transfers entitling them to transportation to their destination, though the other conditions entitling the company to turn the car are present.

Certiorari to recorder's court of Detroit; Connolly, J. Submitted October 12, 1908.  (Docket No. 25.)  Decided November 2, 1908.

The Detroit United Railway was convicted of violating an ordinance, and sentenced to pay a fine of $50.  Affirmed.

*Brennan, Donnelly & Van De Mark* (*John J. Speed,* of counsel), for appellant.

*Bernard F. Weadock* (*P. J. M. Hally,* of counsel), for the people.

Blair, J.   Defendant was convicted in the recorder's court of the city of Detroit of violating the provisions of section 19 of chapter 165 of the compiled ordinances of 1904.   The complaint and the section of the ordinance in question are as follows:

"Harry J. Lowther, being first duly sworn, makes complaint, and says that at the city of Detroit, aforesaid, on the 5th day of February, A. D. 1908, within the corporate lines of said city, to wit, on the Sherman street car line, east bound, at the hour of 6:40 p. m., one Detroit United Railway, a Michigan corporation, operating street cars on said line, did then and there unlawfully and wilfully fail and neglect to operate a regular passenger car, to wit, car No. 1298, through to the end of the route, there being at the time aforesaid no blockade or delay due to causes beyond control, said car having passengers on board, and did then and there unlawfully and wilfully turn said car in the opposite direction at the corner of Concord and Kercheval, the same not being the end of said route, and there being no car following going through to the end of the route in the same block, and the same being done without giving transfers to all passengers therein, entitling them to transportation to their destination, to the evil example of all others in the like case offending, and contrary to the ordinances of said city, in such case made and provided.   Sections 10, 19, chapter 165, pages 283-288 of the compiled ordinances of the city of Detroit for the year 1904."

"Sec. 19. All regular passenger cars operated upon any of the routes named herein shall be run through to the ends of the respective routes, provided that in cases of blockades and delays due to causes beyond the control, cars may be turned for the purpose of restoring service in the opposite direction, provided, however, that cars having passengers on board may not be turned unless a car following and going through to the end of the route is in the same block, and provided transfers shall be given to

all passengers thereon entitling them to transportation to their destination:"

The complaining witness testified that on the day in question he boarded a Sherman street car marked "Limits. "

" It was 6 :40 when we got to the barn. I paid my fare by ticket. The car ran through all right, nothing wrong with it, and, reaching the barn at the corner of Concord and Kercheval avenue, the car was pretty well crowded. Every seat was taken, and people standing along the aisle, and we were simply commanded to change cars. The conductor shouted out, ' Change cars.' No transfers were given.

"Q. Did they want you to take the car ahead ?

"A. I could not say. I didn't hear anything said about it. I was simply ordered to change cars. I did not notice whether there was a ' Limits ' car behind us. I have been thrown out there so often and found none that I simply declined to get off. After that, they turned the car into the barn, and told us we would have to get out. They boarded a lot of street car employés—I counted three on the back of the car—and sent us down town again. I went up to the corner, almost the corner of Mt. Elliott and the street that turns down going west, and then I was put off forcibly. There were three of us forcibly ejected. It was raining at the time I was put off the car. There were 13, I think, that went back down town and refused to get off.

"Q. Those are the ones you invited to stay to make a . lawsuit ?

"A. Yes; to test this business of throwing us off every night. The car went into the barn. I did not get off. Possibly they took air in the barn that night. This car then started back down town. I do not know what became of the passengers that got off the car there. I did not attempt to ascertain whether there was another car there waiting for us or not. I had no transfer to get on another car.

"Q. There was a car waiting ?

"A. I know; but I couldn't tell whether I would be thrown off there, if I had nothing to show that I paid my fare.

"Q. Anyway you didn't get off the car to see?

"A. No, sir.

"*Q*. You didn't get off because you intended to make this a test case?

"*A*. Because I had been thrown off so many times."

It appears from the testimony that the car in question had been sent out to take the place of a crippled car.

"We were going west in the first place, and we had a car 121, and one of the machines gave out. We had to turn the car in west bound, which held us and made us very late, made us 12 minutes late at the west end and we had to make it up. The rails were bad. It was hard to stop the cars, and we got down town four minutes late. I got awful late when I got to the barns. Eight minutes late at the barn, and the carhouse foreman told us to turn, which we had to do to get on time. It takes to run from there to the end of the line, to the limits, nine minutes, and unload the load. The next 'Limits' cars were right back of us. When the foreman told us to turn, I told the passengers to take the car right back of it. The car was standing right there. It followed us all the way up to the barn, pretty near together.  *  *  *

"*Q*. Did you ever offer transfers when you asked them to get out?

"*A*. Yes; if there is no car back of us, but the car was right back of us, and I told the conductor on the car that I had not given them transfers. It wasn't necessary, to transfer them. Only took up time to give them transfers. *  *  *  After we had turned at the barn, we were pretty near on time. It takes to run from Kercheval barn out to the end of the line nine minutes. Nine minutes to run one way and nine minutes to go back. That is the running time.  *  *  *  It had been snowing and raining. The track was covered with ice and snow. Rigs passing along the street piled the snow on the track, made it heavy for the cars to run. It was difficult to make them anywhere near on time. It had been all day."

It further appeared from the testimony that 13 or 14 day run cars were in the barn, and that several conductors and motormen who had finished their day's work were still at the barn, and that they were entitled to pay for all the time they worked.

It is contended by counsel for appellant that—

"The practice in such cases of informing the conductor

of the car to which the change is made that no transfer tickets have been issued and for him not to collect fares is in fact a transfer under the ordinance. After the order by the foreman to return the car is given, to punch and go through the car distributing the transfer tickets would take up some time. This distribution would necessarily have to be made before the announcement to 'change cars' is made to passengers who immediately thereupon would commence to leave the car, and the issuing of these transfers would serve no useful purpose whatever."

This is the only point presented by the brief of counsel for appellant. Counsel for the people contend that the practice followed by the conductor was not a compliance with the provision for transfers, and further insist—

"That, under this ordinance, cars may not be turned except in the cases enumerated, and then only when necessary 'to restore service in the opposite direction.' When the car in question reached the Concord barn, it was peremptorily ordered turned with its 40 passengers when 13 or 14 cars and street car men to operate them were available for use in the car barn. * * * We contend under these conditions that it was not necessary to turn car 1298 in order to restore service in the opposite direction. It would have taken the car 18 minutes to have run from the barn to the end of the route and return, and the men operating it would have been paid for 'every minute they worked.' The cost to the company would have been trivial; the convenience and comfort of the passengers great. These 40 passengers were entitled to ride to their destination without a change of cars. It was the duty of the company to send them on this car to their destination. A car from the barn could have been sent west with the crew of 1298, and the company would not have been incommoded in the least. The service would have remained unimpaired, and the convenience and comfort of the passengers undisturbed."

The undisputed testimony shows that car No. 1298 was delayed from "causes beyond control," viz., the breaking down of car No. 121 and the action of the elements, and that the car was turned "for the purpose of restoring service in the opposite direction." It further appears that, when the car was turned, there was a car in the

same block "following and going through to the end of the route." So far, therefore, as these conditions precedent to the right to turn the car were concerned, they were literally fulfilled. We do not think that the fact that the company had idle cars in the barn and men to operate them affected the company's duty under the ordinance. The provisions of the ordinance obviously contemplate that the passengers on the belated car shall continue their journey on the following car in the same block. It is evident, however, that the respondent did not comply with the letter of the law as to transfers, compliance with which was also a condition precedent to the right to turn the car, and in our opinion it did not comply with the spirit of the law. This is not a civil proceeding on behalf of a passenger, but a prosecution in the name of the people. It has been repeatedly held by this court that it is the duty of passengers to secure evidence of payment of fares, and that a conductor is under no legal obligation to accept their statements that they have paid such fares. *Mahoney* v. *Railway Co.*, 93 Mich. 612 (18 L. R. A. 335); *Brown* v. *Railway Co.*, 130 Mich. 483, 134 Mich. 591; *Vining* v. *Railway*, 122 Mich. 248. The ordinance manifestly intended that the usual paper transfers should be delivered to the passengers, as conclusive evidence of their rights, before the company should have the right to turn the car. If the consent of the passengers that the company might violate the provisions of the ordinance would furnish a complete protection to it for such violation, certainly such consent must be shown or facts from which it would be necessarily implied. While the passengers did not demand transfers and perhaps did not remain on the car for that reason, still they were entitled to them, and, before the conductor could legally insist upon their leaving the car and taking the following car, it was his duty to comply with the provision for transfers. The passengers were insisting upon their right to remain upon this car and go through to their destination and they waived none of their rights.

There is no evidence that they knew of the conversation between the two conductors as to transfers, or that all of them knew of the practice of the company to only give transfers when there was no car following, in which case the ordinance expressly prohibited the turning of the car. The complaining witness testified:

"I couldn't tell whether I would be thrown off there, if I had nothing to show I had paid my fare."

The company could not compel the passengers to accept its practice in place of the ordinance method. They were entitled to the printed evidence of their right which the ordinance required.

Judgment affirmed.

GRANT, C. J., and HOOKER, MOORE, and McALVAY, JJ., concurred.